KAREN LeCRAFT HENDERSON, with whom Circuit Judge BROWN joins,
concurring:
I fully agree with Judge Randolph’s analysis of NLRA section 8(c) and wholeheartedly concur in his well-reasoned opinion. See 29 U.S.C. § 158(c). Judge Brown and I would also hold, however, *966 that the Board is without authority to promulgate the posting rule under NLRA section 6 as well—the issue Judge Randolph does not reach in light of his reliance on section 8(e). Section 6 provides: “The Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by subchapter II of chapter 5 of Title 5, such rules and regulations as may be necessary to carry out the provisions of this subchapter.” 29 U.S.C. § 156. Such “general rulemaking authority,” although facially broad, “does not mean that the specific rule the agency promulgates is a valid exercise of that authority.” Colo. River Indian Tribes v. Nat’l Indian Gaming Comm’n, 466 F.3d 134, 139 (D.C.Cir.2006). Here, I do not believe the posting rule—-which creates a new species of unfair labor practice unforeshadowed in the NLRA’s text—constitutes a valid exercise of the Board’s section 6 authority because the rule is not, as section 6 requires, “necessary” to carry out the express provisions of the Act.
In the Final Rule, the Board claims the posting rule is necessary to carry out sections 1 and 7 of the NLRA, 29 U.S.C. §§ 151, 157. See 76 Fed.Reg. at 54,007 (§ 1); id. at 54,032 (§ 7). Section 1 consists of four paragraphs of general findings the Congress made to justify regulating the collective bargaining process in order to eliminate and mitigate “substantial obstructions to the free flow of commerce,” 29 U.S.C. § 151. Section 7 sets out the general rights “as to organization, collective bargaining, etc.... [that ejmployees shall have,” id. § 157. Neither section contains any particularized “provision” that the Board can “carry out” by regulation or otherwise.* In the past, we have rejected such a “general declaration of policy,” by itself, as authority for a specific regulation, observing that “ ‘[ajll questions of government are ultimately questions of ends and means.’ ” Colo. River Indian Tribes, 466 F.3d at 139 (quoting National Fed’n of Fed. Emps. v. Greenberg, 983 F.2d 286, 290 (D.C.Cir.1993)). An agency, we have stated, is “ ‘bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.’” Id. at 139-40 (quoting MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994)). And the Congress, in enacting the NLRA, prescribed that the Board use reactive means to enforce its policies—namely, through an unfair labor practice proceeding initiated by a charging party or by resolving representation and election issues when so petitioned by a party. See 29 U.S.C. § 160 (empowering Board “as hereinafter provided, to prevent any person from engaging in any unfair labor practice” and thereinafter providing “[wjhenever it is charged that any person has engaged in or is engaging in any such [ULP], the Board ... shall have power to issue and cause to be served upon such person a complaint stating the charges”), § 159 (authorizing Board to “investigate” a petition by employees or employer regarding representation and elections “[wjhenever a petition shall have been filed, in accordance with *967 such regulations as may be prescribed by the Board”), § 161 (setting out Board’s “Investigatory powers ... [f]or the purpose of all hearings and investigations, which, in the opinion of the Board, are necessary and proper for the exercise of the powers vested in it by sections 159 and 160) (emphases added); see also Republic Steel Corp. v. NLRB, 311 U.S. 7, 10, 61 S.Ct. 77, 85 L.Ed. 6 (1940) (NLRA “is essentially remedial” and employee’s right thereunder “is safeguarded through the authority conferred upon the Board to require the employer to desist from the unfair labor practices described and to leave the employees free to organize and choose their representatives”); Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 900, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (“Quite early on, the Court established that ‘the relief which the statute empowers the Board to grant is to be adapted to the situation which calls for redress’ ” (quoting NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 348, 58 S.Ct. 904, 82 L.Ed. 1381 (1938))).
The Final Rule also claims that, as a practical matter, the posting rule is “necessary” to ensure that employees know both what their rights are under the Act and that the Board protects those rights— thereby enabling employees to exercise them under the substantive provisions of the Act. It further asserts that the Board “has reason to think that most [employees] do not” have such knowledge given “the low percentage of employees who are represented by unions, ...; the increasing proportion of immigrants in the work force, who are unlikely to be familiar with their workplace rights; and lack of information about labor law and labor relations on the part of high school students who are about to enter the labor force”—citing as authority three law review articles. Final Rule, 76 Fed.Reg. at 54,006 & nn. 3-4; see also Appellees/Cross-Appellants Br. 15-16. Even assuming these speculative assertions have some factual basis and, as well, that providing such information is “necessary to carry out” the Act’s provisions, there is nothing in the text of the NLRA to suggest the burden of filling the “knowledge gap” should fall on the employer’s shoulders. Unions and the NLRB are at least as qualified to disseminate appropriate information—easily and cheaply in this information technology age—and in fact already do so. See, e.g., http://www.nlrb.gov/rights-we-protect (NLRB’s explanation of covered employee rights, its protection of concerted activity, employer and employee reciprocal rights and obligations and its jurisdiction over private employers). The NLRA—and section 6 in particular—simply does not authorize the Board to impose on an employer a freestanding obligation to educate its employees on the fine points of labor relations law. See Chamber of Commerce of U.S. v. NLRB, 856 F.Supp.2d 778, 792 n. 13 (D.S.C.2012) (“Here, the Board’s interpretation of Section 6 as authorizing the rule does not incorporate any labor-related expertise. See Hi-Craft Clothing Co.[ v. NLRB], 660 F.2d [910,] 918[ (3d Cir.1981) ] (‘This is not a question of the Board applying a broad statutory term to a specified set of facts, but is a case of straightforward statutory construction.’)”).
In sum, given the Act’s language and structure are manifestly remedial, I do not believe the Congress intended to authorize a regulation so aggressively prophylactic as the posting rule. Accord Chamber of Commerce, 856 F.Supp.2d at 790-92; see Amalgamated Transit Union v. Skinner, 894 F.2d 1362, 1364 (D.C.Cir.1990) (“Where Congress prescribes the form in which an agency may exercise its authority, ... we cannot elevate the goals of an agency’s action, however reasonable, over that prescribed form.”).

 In the only other challenge to a section 6 regulation, the United States Supreme Court upheld a regulation prescribing eight (and only eight) appropriate bargaining units for acute care hospitals—a regulation that was "necessary to carry out” the Board's obligation under one of the substantive provisions of the Act, namely, section 9(b) ("The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this sub-chapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof....” 29 U.S.C. § 159(b)). See Am. Hosp. Ass’n v. NLRB, 499 U.S. 606, 111 S.Ct. 1539, 113 L.Ed.2d 675 (1991).